Lawrence M. Hirsig v. Commissioner. Lawrence M. Hirsig, Inc. v. Commissioner.
Hirsig v. Commissioner
Docket Nos. 6537, 6538.
United States Tax Court
1945 Tax Ct. Memo LEXIS 96; 4 T.C.M. (CCH) 848; T.C.M. (RIA) 45279; August 21, 1945
*96 Robert R. Milam, Esq., 1200 Greenleaf Bldg., P.O. Box 58, Jacksonville 1, Fla., and E. T. McIlvaine, Esq., Greenleaf Bldg., P.O. Box 58, Jacksonville 1, Fla., for the petitioners. Frank M. Thompson, Esq., for the respondent. MELLOTT
Memorandum Findings of Fact and Opinion MELLOTT, Judge: These cases, consolidated for trial, present the problem of how to tax the income derived from carrying on the business of a manufacturers' agent. The Commissioner has made two determinations, the affirmance of either of which requires that the other be set aside. The deficiency in Docket No. 6537 is against Lawrence M. Hirsig, an individual (hereinafter called Hirsig), and is in the amount of $3,872.23 for income taxes for the year 1941. The deficiencies in Docket No. 6538 are against Lawrence M. Hirsig, Inc., a corporation (hereinafter called the corporation), and are as follows: Declared Value
Income
Excess
Fiscal Year
Tax
Profits Tax
Total
2-1-41 to 1-31-42
$ 712.03
$200.17
$ 912.20
2-1-42 to 1-31-43
978.53
500.19
1,478.72
$1,690.56
$700.36
$2,390.92
Before making findings of fact the controversy may be brought into focus by outlining *97 what has occurred. Hirsig included in his gross income for 1941 the amount of $11,993.03, representing compensation paid to him by the corporation between January 1, 1941, and June 30, 1941. This amount is not in controversy. No amount was included in his gross income for the period July 1, 1941, to October 31, 1941. The total net income of the business for the last-mentioned period was $6,439.61. This amount was included in the gross income reported by Constance C. Hirsig, his wife, in her return of income for 1941. Hirsig and his wife each included in gross income 50 per centum of the income ($3,235.31 or an aggregate of $6,470.62) of the business for the months of November and December 1941. The Commissioner included in Hirsig's income the $6,439.61 and $3,235.31 reported by his wife. Stated generally it is the contention of each petitioner that the corporation was liquidated on June 30, 1941; that its assets were taken over by Constance C. Hirsig; that she operated the business as an individual from July 1, 1941, until the end of October 1941; that she correctly included the income for that period in her return of income; that she and Lawrence M. Hirsig became partners on November 1, 1941; *98 that they thereafter operated the business as partners; and that the income from and after November 1, 1941, was, as reported by them, divisible and divided equally between them. If these contentions are sustained then there is no deficiency in either case; for the deficiencies against the corporation are based upon the inclusion in its gross income of the same amounts included by the Commissioner in the gross income of Hirsig. [1]
Findings of Fact Lawrence M. Hirsig resides in Jacksonville, Florida. His income tax return for the year 1941 was filed *99 with the collector of internal revenue for the district of Florida. Lawrence M. Hirsig, Inc., is a corporation organized under the laws of the State of Florida in 1934. Its returns for the fiscal years ending January 31, 1942, and January 31, 1943, were filed with the collector of internal revenue for the district of Florida. Hirsig and his present wife, Constance C. Hirsig, formerly Constance M. Wilkes, became acquainted about the middle of the summer of 1932. She had been a school teacher and had also worked in the office of the Western Union in Jacksonville. In January 1933 Hirsig opened an office in Jacksonville, Florida, as territorial agent or representative of several manufacturers of automobile parts and accessories. The territory in which he operates embraces ten states in the southeastern section of the United States. The business is largely personal service and in general consists of selling the products of the manufacturers through salesmen, most of whom work upon a commission basis, receiving for their services a portion of the commission allowed to Hirsig. No inventory is required; but samples and appropriate literature describing the products are prepared by Hirsig *100 for his organization. In the beginning most of the selling was done by Hirsig and he traveled considerably about the territory assigned to him by the manufacturers. As the business developed he spent more time in the office, carrying on correspondence and telephonic communication with the manufacturers and the salesmen working under him, including local representatives of the various manufacturers. He also supervised, or advised with the manufacturers upon, the advertising of the various products in his territory. At the time his present wife entered his employ in 1933 they constituted practically the whole organization. The business grew and expanded until during the taxable years there were four or five employees in the office besides Hirsig and his wife. The relationship of husband and wife was entered into in 1935. In 1934 the corporation was formed. The capital stock consisted of 50 shares of the par value of $10 each. Check for $500, payable to the corporation, was issued by Constance M. Wilkes on January 30, 1934 and she became the equitable owner of all of the stock. Good will was set up on the books of the corporation in the amount of $3,465.79 and she executed a note *101 payable to the corporation in the amount of $2,907.69. The stock was originally issued in three certificates, one to Hirsig for 16 shares, one to Constance M. Wilkes for 16 shares, and one to Elliott Adams, attorney, for 18 shares. In 1936 all of the shares were represented by 3 certificates, one in the name of C. Hirsig for 48 shares and one each in the name of 2 employees, who held their shares for the benefit of Constance C. Hirsig. The property owned by the corporation was nominal, consisting principally of office furniture and equipment. During the years preceding the first taxable year Constance drew salary ranging from $200 to $350 per month and Hirsig drew salary ranging from $450 to $800 per month. Both had drawing accounts with the corporation to which their salaries were credited. Such dividends as were paid were received by Constance. Hirsig was president and Constance was secretary-treasurer of the corporation throughout the period from 1934 to the date of trial. Hirsig and Constance both devoted their entire time to the business of the corporation. Generally they drove to and from work together and Constance's duties as a housewife did not interfere with her devoting *102 full time to the corporation's business. Her work consisted primarily of running the office, taking care of the correspondence, attending to the banking, supervising the keeping of the books and in general serving as office manager. Most of Hirsig's time was devoted to matters of policy, supervising the salesmen, keeping in touch with the trade generally and with the manufacturers and their respective general agents assigned to the states within the territory served. On January 10, 1936, Hirsig's salary was fixed at $450 per month and Constance's at $200 per month. On July 1, 1936, Hirsig's salary was raised to $700 per month and on November 12, 1936, Constance's salary was raised to $300 a month. On April 1, 1940, Hirsig's salary was raised to $800 per month and Constance's to $350 per month. On March 3, 1941, Hirsig's salary was fixed by corporate resolution at $800 a month and Constance's at $350 a month. In addition to his regular salary Hirsig, on December 26, 1940, was voted a bonus of a sum equal to 5 percent of the gross commissions received by the corporation through the year 1940 as additional compensation for the extra effort made by him on behalf of the corporation. *103 The net income or loss of the business and the income taxes paid by the corporation for the fiscal years ended January 31, 1937, 1938, 1939, 1940 and 1941, were as follows: Year
Income
Tax Paid
1937
$3,087.96
$336.26
1938
(530.86)
1939
(3,954.27)
1940
1,229.49
153.69
1941
2,923.55
434.15
On June 18, 1941, a joint special meeting of the stockholders and directors of the corporation was held. At the meeting the offer of Constance C. Hirsig was accepted to purchase the assets of the company at book value thereof as of the close of the month of June 1941. She agreed to pay therefor the sum of $1,000 in cash on or before October 15, 1941 and the balance on or before December 31, 1941. The officers were directed to have an audit made of the books to ascertain the book value of the corporation, "* * * and to take whatever steps might be necessary in order to carry out the sale of this business to Constance C. Hirsig and the liquidation of the company as may be practicable, either by surrendering the charter, or by suspending business after all of the assets are collected, the liabilities discharged and the net worth distributed to the stockholders." The *104 officers, directors and stockholders attending this meeting were Lawrence M. Hirsig, Constance C. Hirsig and Corinne Wiltshire. The assets of the corporation consisted of office equipment having a cost of $1,998.73, less reserve for depreciation of $1,040.54 and good will having an assigned value of $2,466.54. Book entries were made purporting to record a sale from Lawrence M. Hirsig, Inc. to Mrs. Constance C. Hirsig, trading as Lawrence M. Hirsig & Co.; but no money was ever paid by Mrs. Hirsig to the corporation. The corporation was not dissolved. In March 1942 it filed an income tax return for the fiscal year ending January 31, 1942, showing a gross income of $16,045.63 and a net income for declared value excess profits tax of $1,681.93. During this period of time officers salaries aggregating $10,900 were paid, $8,800 to Hirsig and $2,100 to his wife. A corporation income and declared value excess profits tax return for the fiscal year ending January 31, 1943 was filed showing a loss of $16.25. No income for the period after June 30, 1941, was included in the corporation's returns of income. Notices dated June 25, 1941 were set on letterheads bearing the name Lawrence M. *105 Hirsig, Inc., to the corporation's field agents, notifying them of the termination of their agreements to become effective as of June 30, 1941. Under date of June 28, 1941, letters were sent to the same agents enclosing agreements in duplicate to become effective July 1, 1941, with a request that one copy be signed and returned immediately. These letters were signed by Constance C. Hirsig "for Lawrence M. Hirsig & Co." Lawrence M. Hirsig & Co. was a trade name. On August 1, 1941, bulletins were sent to all factories requesting that in the future checks for commissions "should be issued to Lawrence M. Hirsig & Co." These constituted the only written notice to the manufacturers of any change in the business. On August 18, 1941, Constance C. Hirsig was ordered, adjudged and decreed by the Circuit Court in and for Duval County, Florida, to be a free dealer, i.e., competent to contract and be contracted with, to sue and be sued, and to bind herself in all respects as fully as if she were unmarried. Under date of November 1, 1941, Hirsig and his wife executed a memorandum of agreement reciting that Constance "having theretofore purchased from Lawrence M. Hirsig, Inc., a corporation, *106 its entire assets, does hereby sell a 50 percent interest in said assets and business so purchased unto Lawrence M. Hirsig for the sum of $10 and other good and valuable considerations * * *." The memorandum recites that the parties thereto agree that they will become and be partners in said business to be conducted and carried on under the name and style of Lawrence M. Hirsig & Co.; that the business shall be conducted at Jacksonville or at such other place or places as the partners may determine; that the capital "shall be the entire assets purchased as above described; and that the partners are to share in the profits and losses of the business in the same portion as their interest is hereinabove described." Each of the partners was to give his undivided time and attention to the business, each was to be permitted to draw $900 per month for his or her living expenses and other general partnership provisions were set out. No new contracts of employment were made with the salesmen then employed in the business subsequent to the execution of the memorandum agreement of November 1, 1941. None of the contracts between Hirsig and the manufacturers, or between the corporation and the *107 manufacturers was ever assigned to Constance C. Hirsig or to the partnership and no contract to sell the products of any manufacturer was ever made with Constance C. Hirsig alone, or with her individually, or with her trading as Lawrence M. Hirsig & Co. The success of the business throughout its existence depended upon the personal services, industry, skill and acquaintance of Hirsig and Constance. Since the execution of the memorandum agreement of partnership Hirsig and Constance have devoted their full time and attention to the business and the net earned commissions have been in excess of $30,000 per annum. Since November 1, 1941 to the date of trial in February 1945, the net income has been divided equally between Hirsig and Constance and their respective shares have been drawn. The Commissioner made the adjustments indicated in the preliminary statement and determined the deficiencies set out above. Opinion The conflicting determinations of the Commissioner detract from, if they do not completely nullify, any presumption of correctness otherwise attributable to them. Cf. . The gist of his argument upon brief is that it is *108 wholly unrealistic to divide the income of one business for one year into so many parts. As he expresses it, the petitioners seem to be insisting "upon the recognition of four taxpaying entities" - Hirsig, the corporation, the wife and a partnership composed of Hirsig and his wife. Petitioners urge that they and Hirsig's wife had a "perfect right to do" precisely what was done; that the interested parties chose to carry on the business during the first six months of 1941 as a corporation and correctly reported the income for that period; that Constance, as the owner of the stock of the corporation, elected to liquidate it completely and did so as of June 30, 1941; that thereafter and during the months of July, August, September and October she carried on the business as a free dealer or individually, Hirsig not being paid for the services rendered by him; that she correctly included in her gross income all of the earnings during this period; that she, being the owner of the "business", chose to assign a half interest in it to her husband, Hirsig, on November 1, 1941; and that they thereafter operated it as equal partners. The parties both place considerable emphasis upon the fact *109 that the business was almost exclusively attributable to personal services. Respondent urges that the business had been organized and carried on solely by Hirsig and that his wife's work had been merely general office work. He therefore insists that under the rationale of such cases as , certiorari denied ; , certiorari denied ; , affd. , certiorari applied for June 19, 1945; , and similar cases his determination that the income is all taxable to Hirsig should be upheld. Cf. , affd. , certiorari applied for July 26, 1945, and note vigorous dissent of Judge Fake. See also (promulgated June 30, 1945) and cases therein cited. Compare (10 C.C.A. July 19, 1945), *110 (10 C.C.A. July 19, 1945), and Levine v. Commissioner, - Fed. Supp. - (D.C. Northern District of Texas, June 18, 1945). He attempts to support his determination that the income is all to be included in the gross income of the corporation by pointing out that it is still alive and continuing to file income tax returns; that it still has title to its assets since no payment for them has ever been made by Mrs. Hirsig; that the corporation has been kept alive for the purpose of avoiding running afoul of the Florida law (Sec. 5975 Compiled General Laws of Florida) which prohibits carrying on a business under any trade name or style which includes the word "corporation", "company", "association", etc., unless the trade name also includes the words "not incorporated"; and that the situation is not unlike that of the taxpayer in . He also cites ; (on appeal ) and . Petitioners cite several early decisions of *111 this tribunal and appellate courts; also , reversed ; ; and . Pointing out that Mrs. Hirsig "worked every day in the business" they insist that the rule of the Earp and Mead cases is not applicable and that the income may not, under any reasonable view, be included in toto in Hirsig's gross income. They also attempt to distinguish the cases relied upon by the Commissioner to support his determination that all of the income is taxable to the corporation. Extended discussion of decided cases by us is not desirable or required in the present case. Perhaps the principles to be applied will remain in a fog of uncertainty until stated authoritatively by the Supreme Court or clarified by Congress. In the meantime, however, we may not shirk our duty but must continue to find an answer in each case. The right one under the present facts, however, is elusive. Departing from the order adopted by the parties in discussing the several questions upon brief, the alleged partnership of Hirsig and his wife for the last two *112 months of 1941 will be examined first. These facts stand out. The success of the business depended very largely upon the personal service, skill, industry and acquaintance of both Hirsig and his wife. She had spent several years working at his side, attending to many of the details of the business. He was thus enabled to devote his entire time to the larger problems. During his absence she performed, the duties usually performed by him. She had an acquaintance with the salesmen selling the products to the trade, familiarity with the several lines, and could and did discuss intelligently, with representatives of the various manufactures, the problems presented. She attended meetings of sales groups, conventions, etc., and participated in the discussions. She, as well as her husband, made speeches to such groups and generally promoted the business. Outsiders - bankers and others - considered her to be a full partner of Hirsig. He and she, at least since the execution of the memorandum of agreement under date of November 1, 1941, considered themselves to be partners; and the evidence indicates that since that date to the date of trial the income has been divided equally between them. *113 Passing, at this juncture, the recitations in the document anent an alleged "sale" of a 50 percent interest in the business to her husband for $10, we think it is clear that the parties intended to, and actually did, create a bona fide partnership for the purpose of carrying on the business of manufacturers' representative on November 1, 1941. We therefore decline to approve the inclusion of the $3,235.31, reported by Constance C. Hirsig as income from the partnership, in the gross income of Hirsig or in the gross income of the corporation. But while we are of the opinion that the husband and wife did ultimately form a valid partnership, we cannot accept their treatment of the income for the months of July, August, September and October 1941. Manifestly it is impossible to adopt the two conflicting theories suggested by respondent and alternatively espoused by him. The income could not be both the income of the corporation and of Hirsig. Before determining which it actually belonged to we will pause to point out why we think it did not belong solely to the wife, as reported in the returns. In the first place it is utterly unreasonable to believe that Constance C. Hirsig ever became *114 the sole representative of the several manufacturers to the exclusion of her husband. He remained at the office, working every day, obviously co-operating with his wife fully, even to the extent of assisting her in taking the property of the corporation and consenting to the use of his name as a trade name. That all of this was mere pretense is indicated by several circumstances. Thus, ostensibly, she appropriated to her own use the customers developed, the trade secured, and the salesmen trained by Hirsig even before he and she had met and married. It is inconceivable that he would have permitted that to be done by anyone other than by a member of his intimate family group. Whether he was motivated by love or by a desire to save taxes is not clear. Moreover no new contracts were made with the manufacturers. They had been dealing for years with Lawrence M. Hersig. It was a matter of indifference to them whether he chose to operate as an individual, as a corporation, or under a trade name. The request that checks for commissions be made payable to Lawrence M. Hirsig & Co. therefore, is without significance. These are only a few of the circumstances impelling us to hold, as we do, that *115 Constance C. Hirsig was not the owner of the business or the earner of the income during the period from July 1, 1941 to October 31, 1941. But having reached the conclusion set out in the preceding paragraph the question yet remains whether the income of the business during that period should be included in the gross income of the corporation or in the gross income of Hirsig. We hold that it - except salary of $350 per month to Constance, or an aggregate of $1,400 - should be included in Hirsig's gross income for reasons which will be briefly stated. The evidence establishes that the business belonged to Hirsig at the time his present wife began to work for him. Just why the corporation was ever established is far from clear. There is no showing that Hirsig was not amply able to purchase the furniture and office equipment being used nor has any reason been given why it should ever have been put in the name of the corporation if indeed it ever was. The evidence surrounding the whole transaction is quite meager. A check for $500 signed by Constance M. Wilkes and payable to the order of the corporation was introduced as an exhibit. It was the initial deposit in a bank account opened *116 in the name of the corporation. Whether the corporation purchased the furniture from Hirsig or not was not shown. The exhibit offered to show the "Entries to Open Corporation" is as follows: Dr.
Cr.
Cash
$ 500.00
Capital Stock
$ 500.00
Office Equipment
100.00
Office Supplies
5.00
Goodwill
3,465.79
Organization Expense
75.00
Notes Payable
2,907.69
Notes Payable
500.00
Accounts Payable
238.10
$4,145.79
$4,145.79
Mrs. Hirsig testified that the check was paid "to buy the stock to give us capital to operate on." When asked under cross-examination what the rest of the corporation was and what were its assets she replied: A. Desks and chairs and typewriter and good will, and that is all. Q. Wasn't there a chap named Hirsig in that corporation? A. Yes, sir. Q. Did he go along with it? A. Why sure. Q. Wasn't he the one who produced the income, at least at the start? A. He contributed his part to it. * * *
Q. Well, you wouldn't make money then without his efforts? A. That's right, nor without mine. Q. Did you have any understanding with Mr. Hirsig about the ownership of this corporation, as to whether he would get *117 anything out of it at all? A. Neither of us talked very much about what we were going to get out of it. Our principal concern in those days was what we could put in it and there wasn't any understanding what we could take out of it. We were just going to put into it and try to do the business. Q. But on the record it seems that he put into it and had no evidence of any ownership in it and he didn't have a single share of stock? A. (No response). Q. Doesn't that seem a little odd? A. No, I don't think so. Hirsig, testifying as a witness, cast little more light upon the creation, existence, vitality or demise of the corporation; but his evidence tends to support the conclusion we have reached that the net earnings of the business (except a salary of $350 per month for his wife) during the period from July 1, 1941, to October 31, 1941, should be included in his gross income. He stated that the "situation" in connection with the organization of the corporation and the issuance of its stock was "exactly as Mrs. Hirsig outlined it." When asked why he decided to go into partnership he replied: A. Well, it was a personal service corporation, so to speak, and the fact we were *118 operating as partners, that seemed to be a more financially satisfactory method of operation, it was that, in fact, so we might as well make it that in all other details. He admitted that the business continued precisely the same after July 1, 1941, as before, that no new contracts were made with the manufacturers, and that "the same organization carried on." When asked what became of the corporation he stated that Mrs. Hirsig bought its assets and "the corporation ceased to function and it was closed out and liquidated, or practically so, I think Mrs. Hirsig still owes it some money, but she owns the corporation, so I don't suppose the corporation would object, if it is still in existence." The answer set out above and the whole record supports the conclusion that throughout the existence of the corporation it was never more than an empty shell - a mere sham or device adopted to carry on Hirsig's business. We, of course, would hestitate to reach any such conclusion in the face of the recent decision by the Supreme Court in the Moline Properties, Inc., case, supra, if petitioner were urging that be done for the purpose of avoiding tax. But the question is more fundamental than *119 merely whether the corporation shall be recognized. The individual (Hirsig) is attempting to escape tax on the theory that the corporation had real vitality and existence, and, through its corporate action, gave birth to a new tax-paying entity - his wife, carrying on business under a trade name. We have been admonished often to adopt a practical and realistic approach in dealing with tax problems. Thus in , the Supreme Court stated that it could not "too often reiterate that 'taxation is not so much concerned with the refinements of title as it is with actual command over the property taxed - the actual benefit for which the tax is paid'. . * * * And it makes no difference that such 'command' may be exercised through specific retention of legal title or the creation of a new equitable but controlled interest, or the maintenance of effective benefit through the interposition of a subservient agency. Cf. * * *." In , it taxed the income of a short-term trust to the settlor because of his retained *120 control over the income and corpus, notwithstanding the fact that the trust appeared to have been created for the benefit of members of his family. In , it was said that "the Government may look at actualities and upon determination that the form employed for doing business * * * is unreal or a sham may sustain or disregard the effect of the fictions as best serves the purpose of the tax statute." There is therefore ample authority for holding, as we do, that the income realized during July, August, September and October of 1941 - with the exception of a salary to the wife - was the income of Hirsig and properly includible in his gross income. The fact that the corporation continued to maintain a semblance of existence and filed income tax returns is, of course, a circumstance supporting respondent's determination that the income should be included in its gross income; but it likewise supports petitioners' contention that its liquidation had the result they contend for. Since we have been compelled to make an election we think it is far more reasonable to include the income in Hirsig's gross income. Such history of the corporation's alleged *121 existence as we have been able to glean from the record indicates that it, at all times, was a mere subservient agency. Thus it is noted that in 1940, when the income, in spite of the salaries paid, approached the point where a substantial income tax might become due, a "bonus" of 5 percent of the gross commissions was paid over to Hirsig. In 1941, when the income continued to mount, more drastic action was required. An alleged new taxpaying entity was set up and Hirsig "worked" for it - his wife, under a trade-name according to the theory adopted - without pay. To accept this theory imposes too great a strain upon our credulity. But respondent's suggestion that the income be taxed to the corporation notwithstanding its apparent attempt to liquidate seems to be equally unsound. We approve the respondent's inclusion in Hirsig's gross income for the year 1941 of $5,039.61, this being the net income from the business during the months of July, August, September and October less a salary to his wife of $350 per month. The deficiencies in tax against the corporation are set aside. In Docket No. 6538 decision will be entered for the petitioner. In Docket No. 6537 decision will be entered *122 under Rule 50. Footnotes
1. The Commissioner also included in the gross income of the corporation for the first fiscal year the income of the business for the month of January 1942, the corporation's fiscal year ending on January 31. The deficiencies against the corporation for the fiscal year ending January 31, 1943, resulted from the inclusion in its gross income of all the income from the business for that period. Inasmuch as a portion of the tax against the individual was forgiven by a later revenue act and there was a change in the manner and time of reporting income, no corresponding determination was made against Lawrence M. Hirsig, individually.↩